UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

CARLSON RESTAURANTS WORLDWIDE,  )
INC.,                          )
                               )
          Plaintiff            )
                               )
     v.                        )    Case No. 2:06 cv 336
                               )
HAMMOND PROFESSIONAL CLEANING  )
SERVICES; FERNANDO LOPEZ, SR.; )
RELIABLE FIRE EQUIPMENT CO.;   )
ANSUL INCORPORATED,            )
                               )
          Defendants           )

## OPINION AND ORDER

This matter is before the court on the Motion to Compel
Discovery from Defendant Ansul, Inc. [DE 59] filed by the plain-
tiff, Carlson Restaurants Worldwide, Incorporated, on April 1,
2008; the Motion for Protective Order [DE 62] filed by the
defendant, Ansul, Incorporated, on April 21, 2008; the Motion to
Compel Ansul, Inc. to Present Affiants for Depositions, Answer
Interrogatories and Produce Materials [DE 83] filed by Carlson on
June 6, 2008; the Motion to Compel Ansul, Inc. to Produce Docu-
ments Requested in Plaintiff's Third Set of Production Requests
[DE 92] filed by Carlson on July 15, 2008; and the Motion for
Reconsideration [DE 105] filed by Ansul, Inc. on November 26,
2008.  For the reasons set forth below, the Motion to Compel
Discovery from Defendant Ansul, Inc. [DE 59] is **GRANTED**; the
Motion for Protective Order [DE 62] is **DENIED**; the Motion to
Compel Ansul, Inc. to Present Affiants for Depositions, Answer

Interrogatories and Produce Materials [DE 83] is **GRANTED**; the Motion to Compel Ansul, Inc. to Produce Documents Requested in Plaintiff's Third Set of Production Requests [DE 92] is **GRANTED**; and the Motion for Reconsideration [DE 105] is **DENIED**.

<u>Background</u>

This matter arises from a fire at a TGI Fridays Restaurant in Merrillville, Indiana, operated by the plaintiff, Carlson Restaurants Worldwide. In its complaint, Carlson alleges that fault for the fire was attributable to three entities - Hammond Professional Cleaning Service for the negligent cleaning and maintenance of the restaurant's grilling system, Reliable Fire Equipment for its failure to maintain the restaurant's fire suppression system properly, and Ansul, Incorporated, the manu-facturer of the fire suppression system, for negligence and a defective product.

Ansul sells its fire suppression system components to authorized distributors, who then sell, design, and install the systems for consumers such as Carlson. The Ansul systems utilize a chemical fire suppression agent - the Ansul low pH agent, Ansulex - which is stored in tanks until the temperature sensors trigger its release through nozzles aimed at cooking areas which may be on fire. Problems with Ansulex crystallizing and blocking the nozzles led Ansul to implement a program in November 1995 whereby servicemen examined the tanks for crystallization and added a second chemical, EDTA, to the tank to ward off system-debilitating crystallization and corrosion. However, if an

examination of a system revealed crystallization already in progress, the corrective action program required the existing Ansulex in the system to be drained, the system to be thoroughly cleansed, and the tanks to be refilled with new Ansulex and EDTA.

The fire suppression system in question at the Merrillville TGI Fridays was installed by the distributor in March or April of 1995. The local fire department performed its final occupancy inspection of the restaurant on March 31, 1995, at which time the system was deemed fully installed and operable. The first service visit performed by Reliable took place on April 26, 1996. During that service call, the "Ansul Inspected" sticker was affixed to the system to denote performance of the newly required corrective actions for the prevention of crystallization, and the inspection report included the notation, "Ansul Inspected EDTA added." The fire occurred on May 10, 2005, and this cause of action commenced on October 6, 2006.

Ansul filed a Motion for Summary Judgment on April 21, 2008, contending that, based upon the elapsed time from the date the system was installed to the date of the fire, the Indiana Product Liability Act's statute of repose precluded a finding of liability ten years or more after delivery of Ansul's product. Ansul's summary judgment position was that the system itself was the delivered product and any addition of Ansulex and/or EDTA was a "mere repair," which would not extend the statute of repose. Carlson countered that although the system was delivered more than ten years before the fire, the addition of new and defective

Ansulex and/or EDTA in April 1996 represented "delivery of the product," restarting the clock on the IPLA's statute of repose. This court, construing these facts in the light most favorable to the nonmoving party, denied the motion. The details of what actions were taken at the service call where the corrective action was implemented were omitted from the factual evidence presented: it could not be determined whether the system showed no crystallization and only EDTA was added at the inspection or whether crystallization was present, the system was drained, cleaned and refilled with all new chemicals. Thus, the motion was denied based upon the question of fact as to what "product" was delivered by Ansul, the system itself or the Ansulex and/or EDTA, which precluded a conclusion of law on the start of the statute of repose.

Prior to Ansul's filing of its Motion for Summary Judgment, Carlson filed a Motion to Compel, requesting that the court require Ansul to answer two interrogatories. Ansul responded to this motion on the same date that it filed its Motion for Summary Judgment, and the response asked the court for a Protective Order based upon the relevance of the information requested and the undue burden that answering would entail. That same day, Ansul separately filed a Motion for Protective Order which reiterated the same arguments. Nine days later, Ansul filed two Affidavits in Support of the Motion for Protective Order: one from Richard Seaberg, the Manager of Quality Assurance at Ansul, claiming problems of locating and identifying "complaints" or "claims" of

customers, and one from Mitchell J. Hubert, the Manager of Agent Chemistry/Research and Development asserting that information about testing of the "numerous special hazard fire protection products" at Ansul was stored within an antiquated database which presented insurmountable search complications.

In response, Carlson served Hubert and Seaberg with notices of deposition, but counsel for Ansul refused to comply, citing the "simplicity" of the pending Motion for Summary Judgment and the attempt at a "fishing expedition" in conducting such depositions. Ansul rested upon its IPLA statute of repose argument, stating that the precise nature of any defect in the fire suppression system or its agents was irrelevant and that the sole concern for Carlson was whether corrective actions were taken by the distributor/maintenance provider, Reliable.

Carlson filed another Motion to Compel on June 6, 2008, seeking a court order requiring Ansul to present Seaberg and Hubert for their depositions, to answer the final seven interrogatories propounded, and to respond to various production requests. Ansul refused to address the interrogatories, claiming that the pending Motion for Summary Judgment would eliminate the need for Ansul's involvement and that the final six questions were over the 25 question limit. Carlson pointed out that the joint discovery plan had an agreed limit of 60 interrogatories and that at no time did Ansul object to the discovery plan. Ansul contested the production requests claiming various boilerplate reasons including irrelevancy and undue burden due to

volume of records involved.  Ansul also averred that the affida-
vits used to present evidence about the testing and complaints
were not relevant to the material issues of this case.

On July 15, 2008, Carlson filed its Motion to Compel Ansul,
Inc. to Produce Documents Requested in Plaintiff's Third Set of
Production Requests.  The motion sought a court order for Ansul
to provide promotional materials and brochures for the R-102
system and various records exchanged between Ansul and Reliable.
Due to various delays and extensions of time, Ansul's response
was filed on December 5, 2008, almost a month after this court
denied its Motion for Summary Judgment.

Finally, after the court denied Ansul's Motion for Summary
Judgment, Ansul filed its Motion for Reconsideration, explaining
that the Ansulex Low pH Corrective Action Program was a remedy
which could not provide a new start to the IPLA's statute of
repose.

Discussion

Although they are frequently filed, the Court of Appeals has
described a motion for reconsideration as "a motion that, strict-
ly speaking, does not exist under the Federal Rules of Civil
Procedure." *Hope v. United States*, 43 F.3d 1140, 1142 n.2 (7th
Cir. 1994). *See also Talano v. Northwestern Medical Faculty
Foundation, Inc.*, 273 F.3d 757, 760 n.1 (7th Cir. 2001). This
type of motion "is a request that the [Court] reexamine its
decision in light of additional legal arguments, a change of law,
or perhaps an argument or aspect of the case which was over-

looked." ***Ahmed v. Ashcroft***, 388 F.3d 247, 249 (7th Cir. 2004)
(internal quotation omitted). *See also **U.S. v. Ligas***, 549 F.3d
497, 501 (7th Cir. 2008)("A district court may reconsider a prior
decision when there has been a significant change in the law or
facts since the parties presented the issue to the court, when
the court misunderstands a party's arguments, or when the court
overreaches by deciding an issue not properly before it.").  In
***Frietsch v. Refco, Inc.***, 56 F.3d 825 (7th Cir. 1995), the Court
of Appeals did not question the availability of a motion to
reconsider but stated:

> It is not the purpose of allowing motions for
> reconsideration to enable a party to complete
> presenting his case after the court has ruled
> against him.  Were such a procedure to be
> countenanced, some lawsuits really might
> never end, rather than just seeming endless.

> 56 F.3d at 828

*See also **Oto v. Metropolitan Life Insurance Company***, 224 F.3d
601, 606 (7th Cir. 2000)("A party may not use a motion for recon-
sideration to introduce new evidence that could have been pre-
sented earlier."); ***Divane v. Krull Electric Company***, 194 F.3d
845, 850 (7th Cir. 1999); ***LB Credit Corporation v. Resolution
Trust Corporation***, 49 F.3d 1263, 1267 (7th Cir. 1995).  Ulti-
mately, a motion for reconsideration is an "extraordinary remedy
to be employed sparingly in the interests of finality and conser-
vation of scarce judicial resources." ***Global View Ltd. Venture
Capital v. Great Central Basin Exploration***, 288 F.Supp.2d 482,
483 (S.D.N.Y. 2003)(internal quotation omitted).

Ansul repeats its explanation of the IPLA and the corrective action taken to eliminate the possibility of the Ansulex to generate crystals, clarifying its belief that "[a]ny claim by plaintiff that the Ansul agent was defective or that the addition of EDTA to the agent failed to cure a defect in Ansul's agent relates to a condition that existed in Ansul's product when it was sold and placed in the fire suppression system at issue more than 10 years before . . . ."  (Reply to Mot. to Recons. p. 2) The court agrees that such an explanation would preclude liability due to the IPLA's statute of repose.  However, Ansul ignores the gist of the opinion.  Ansul's corrective action program offered two alternative means of correcting the problem:  servicemen examine the tanks for crystallization and add EDTA to ward off crystallization and corrosion *if an examination of the system did not reveal crystallization already in progress*, or, *if examination of the system revealed crystallization already in progress,* the corrective action required the existing Ansulex to be drained, the system to be thoroughly cleansed, and the tanks to be refilled with *new* Ansulex and EDTA.  The corporately-dubbed chemical, Ansulex, appears to be a "product" which is manufactured and sold by Ansul for use in its fire suppression systems, and nothing put forth by Ansul convinces the court otherwise.

No information about the service call that occurred on April 26, 1996, was provided other than that the "Ansul Inspected" sticker was affixed to denote performance of the corrective action.  *Which* corrective action was performed is a mystery:  was

EDTA added to the original Ansulex to ward off future crystalli-
zation and corrosion?  Or did the system examination reveal
crystallization in progress, requiring drainage of the existing
Ansulex, system cleansing, and the new Ansulex with EDTA added as
a new, but defective, component part.  If the first occurred, the
EDTA appears to have been added in an attempt to extend the life
of the original faulty chemical product which inevitably crystal-
lized even after the addition of the EDTA.  As forewarned in
***Richardson v. Gallo Equipment Co.***, 990 F.2d 330, 331 (7th Cir.
1993), the court cannot allow Ansul to obtain immunity from
products liability should an added component prove ineffective in
curing the defect simply by the fortuity of adding the product
less than ten years before the fire. ("[M]erely by incorporating
a defective component into an old product the incorporator cannot
obtain the protection from suit that the statute of repose gave
the old product.").  If the second occurred, the fact that the
system was thoroughly cleaned and refilled with new chemical
products, then the new Ansulex with EDTA was a defective new
component which restarted the statute of repose.  *See **Richardson***,
990 F.2d at 331 ("Unless the component is defective and cause the
injury, the suit is barred by the statute of repose . . . .").
Clearly, if the system was completely cleansed and refilled with
new chemical which later crystallized and failed in its purpose,
the new component – the fresh Ansulex and EDTA – was defective.

   To reiterate the earlier opinion, without further discovery,
the question of what happened at the Ansul Inspected service call

is unclear.  Ansul's insistence that the corrective action was definitively a "repair" or "remedy" is futile, for clearly the Seventh Circuit has given specific guidance as to exactly which repairs and remedies reset the statute of repose.  Without a clearer factual record, no legal decision on this point can be made.

Ansul also argues in its Reply that the addition of EDTA during the service call did not constitute placing a product in the stream of commerce, which is a basic element of any claim filed under the IPLA.  However, nowhere in the briefs or exhibits provided was this statement supported by factual evidence.  The court is under the impression that the chemicals involved are produced by Ansul and distributed by the maintenance contractor during the service calls, most likely at a charge.  Notwithstanding such an argument, without factual evidence demonstrating exactly which corrective action was taken at the service call in question, the issue remains as to whether only EDTA was added or whether the entire system was given fresh Ansulex with EDTA, so the question of whether EDTA is an Ansul product is moot.

Finding no new legal arguments, no new evidence, and no argument which was inadvertently overlooked in the denial of summary judgment, the Motion to Reconsider is **DENIED.**

A party may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense - including the existence, description, nature, custody, condition and location of any documents or other tangible things and the

identity and location of persons who know of any discoverable matter." Federal Rule of Civil Procedure 26(b)(1). For discovery purposes, relevancy is construed broadly to encompass "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." ***Chavez v. DaimlerChrysler Corp.,*** 206 F.R.D. 615, 619 (S.D. Ind. 2002) (quoting ***Oppenheimer Fund, Inc. v. Sanders,*** 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978)). Even when information is not directly related to the claims or defenses identified in the pleadings, the information still may be relevant to the broader subject matter at hand and meet the rule's good cause standard. ***Sanyo Laser Prods., Inc. v. Arista Records, Inc.***, 214 F.R.D. 496, 502 (S.D. Ind. 2003). *See* ***Adams v. Target,*** 2001 WL 987853, *1 (S.D. Ind. 2001) (*quoting* Rule 26(b)(1)) ("For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."). *See also* ***Shapo v. Engle,*** 2001 WL 629303, *2 (N.D. Ill. May 25, 2001) ("Discovery is a search for the truth.").

A party may seek an order to compel discovery when an opposing party fails to respond to discovery requests or has provided evasive or incomplete responses. Federal Rule of Civil Procedure 37(a)(2)-(3). The burden "rests upon the objecting party to show why a particular discovery request is improper." ***Kodish v. Oakbrook Terrace Fire Protection Dist.***, 235 F.R.D. 447, 449-50 (N.D. Ill. 2006). The objecting party must show with specificity that the request is improper. ***Graham v. Casey's***

*General Stores*, 206 F.R.D. 253, 254 (S.D. Ind. 2002). That burden cannot be met by "a reflexive invocation of the same baseless, often abused litany that the requested discovery is vague, ambiguous, overly broad, unduly burdensome or that it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence." *Burkybile v. Mitsubishi Motors Corp.*, 2006 WL 2325506, *6 (N.D. Ill. Aug. 2, 2006) (internal quotations and citations omitted). Rather, the court's broad discretion in deciding such discovery matters should consider "the totality of the circumstances, weighing the value of material sought against the burden of providing it, and taking into account society's interest in furthering the truth-seeking function in the particular case before the court." *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 681 (7th Cir. 2002) (*quoting Rowlin v. Alabama,* 200 F.R.D. 459, 461 (M.D. Ala. 2001)).

Carlson's Motion to Compel Discovery from Defendant Ansul, Inc. [DE 59] requests complete answers to two interrogatories, numbers 13 and 16. Interrogatory 13 asks:

> State whether any lawsuit, claim, complaint or notice of a fire has been made against a defendant within 10 years prior to the fire, or since the fire, that resulted in personal injury, death or property damage. If so, identify the following:
>
> > (a)  The name and location of the person, business or entity that sustained the injury, death or damage;
>
> > (b)  The date of the fire;

        (c)   The name and last known address of
               the attorney who represented the
               injured or damaged party;

        (d)   The person form defendant most
               knowledgeable about the fire.

Ansul objected to this question with boilerplate grounds concern-
ing breadth, burden, relevance, and protected work product.
Ansul then supplemented its answer by self-imposing only a five-
year period prior to the fire and stating that there have been no
lawsuits filed against Ansul during that period.  Ansul relies on
***Bitler Investment Venture, II, LLC v. Marathon Ashland Petroleum,***
***LLC***, 2007 WL 1164970 (N.D. Ind. Apr. 18, 2007), to argue that
Interrogatory 13 is overly broad in its request.  In ***Bitler***, the
plaintiffs requested vast quantities of documents about all other
properties that the defendants handled, and the court noted that
the plaintiffs did nothing to demonstrate that there was any
similarity between the plaintiffs' properties and the others
which would make the request relevant.  ***Bitler***, 2007 WL 1164970
at *3.

    Carlson's request here is distinguishable.  Contrary to
Ansul's protestation that the interrogatory encompasses every
phone call, verbal complaint, and legal complaint aimed at the
corporation, the question appears pointed and narrow - especially
when aimed at a corporation which sells fire suppression systems.
The question does not require notes from every phone conversa-
tion, etc., as is portrayed by Ansul's briefs, but clearly asks
about customers who have communicated in some way *as a result of*

*a fire*. It is inconceivable that a corporation which sells fire suppression systems would not keep a record of when such systems gave rise to complaints about subsequent fires. Additionally, the product specifically used by Carlson in its restaurant had problems which required corrective action to be taken, and it is relevant and reasonable for Carlson to request information concerning other failures of similar systems. Unlike the various factors which contributed to independent property valuation in *Bitler*, any failure due to the crystallization of Ansulex which resulted in a fire is relevant and fair game. Thus, the request's time parameter beginning in 1995, the year that Ansul discovered the crystallization problem and implemented the corrective action program, to the present, is reasonable.

Interrogatory 16 asked Ansul to "describe all testing performed as part of the 'Ansulex Low pH Corrective Action Program,' along with the results of the testing." Ansul responded again with boilerplate objections, then supplemented by raising the possibility that such information "may be" protected by attorney-client privilege, work product doctrines, or perhaps, could be confidential, proprietary and trade secret. Despite such claims, Ansul has not produced any privilege log to that effect. Ansul, in its response, added:

> Ansul states that as part of the "Ansulex Low
> pH Corrective Action Program" tests were
> performed to determine what was causing crys-
> tals to form in the R-102 tanks and tests
> were also performed to determine the proper
> remedy to prevent the formation of such crys-
> tals. The results of the tests on what caus-

14

ed the crystals were that in some instances
crystals of acetate and citrate with an iron
ligand formed on a carbon steel tube assembly
or tank wall when the composition of the
Ansulex agent inside the fire suppressant
tank reached a threshold concentration of
approximately one hundred parts per million
of ferrous iron.  Results of the tests on the
remedy for the crystals were that the addi-
tion of EDTA stopped or inhibited the compo-
sition of the Ansulex agent inside the fire
suppressant tank from reaching a threshold
concentration of approximately one hundred
parts per million of ferrous iron by chelat-
ing any ferrous iron as it was leaching from
the tank or pick up tube.

(Ansul Resp. p. 3)

Ansul conceded that "no one can dispute that buildup or blockage
occurred within the tank and pick up tube" and caused the failure
of the fire suppression system at the restaurant.  (Ansul Resp.
p. 12)  However, Ansul assumed that its corrective action program
relieved it of all responsibility, claiming that any problems
which occurred with the system were due to Reliable's implementa-
tion of the corrective action program.  (Ansul Resp. p. 13)  In
light of the reasoning applied to the denied Motion for Summary
Judgment, such a conclusion was premature.

Carlson's Interrogatory 16 did not ask for *every* document
accumulated in Ansul's product testing across the board, but
specifically asked about the testing involved in the corrective
action program.  Such a request is obviously relevant due to the
failure of that program in this instance.  Ansul's assumption
that its product was not at fault, but that the fault rests on
the service provider, still is a factual question that is unan-

15

swered at this time. Discovery and expert analysis of the testing involved will help to answer such contentions. As such, Carlson's interrogatory is relevant and any burden of providing such test results is outweighed by the value such information can provide in the search for the real cause of this loss. Therefore, the Motion to Compel Discovery from Defendant Ansul, Inc. [DE 59] is **GRANTED.**

Ansul filed its Motion for Protective Order requesting an order barring the discovery sought by Carlson. Much of Ansul's argument in favor of its motion relied on its stance in its Motion for Summary Judgment, which now has been denied twice. In light of the above analysis for the Motion to Compel related to the same interrogatories and the failure of Ansul's IPLA summary judgment arguments, the Motion for Protective Order [DE 62] is **DENIED.**

Carlson's next Motion to Compel can be broken down to three types of requests: first, that the affiants utilized by Ansul to propound conclusory statements concerning the testing and customer complaints and claims be compelled to attend depositions; second, that answers to eight additional interrogatories be provided; and third, that six production requests be answered. Ansul's Response offers two legal arguments: unwaivering reliance on the IPLA statute of repose and a mistaken application of the standard of review for motions to compel. The IPLA argument already was discussed above. Next, Ansul's faulty interpretation of the applicable standard for the motions to compel stems from

its appropriation of the standard applied to a district court's decision to deny a motion to compel *when it is reviewed for abuse of discretion by a Circuit court*. (*See* Ansul Resp. p. 3) (explaining that such a denial by a district court will not be reversed absent a "clear showing that the denial of discovery resulted in actual and substantial prejudice") (*citing **Bilow v. Much Shelist Freed Denenberg Ament***, 277 F.3d 882, 895 (7th Cir. 2001)). Ansul has applied this standard of appellate review to argue that Carlson must show "actual and substantial prejudice" from a denial of the motion to compel. Because this inaccurate standard is the basis for all of Ansul's arguments on this motion, the court will not address this case law further in analyzing each of the discovery requests.

As to the first, Ansul belatedly has offered the opinions of its employees, Seaberg and Hubert, in an attempt to show that discovery requests in the testing and complaint departments were unnecessary, and then refusing to allow Carlson the opportunity to delve into their reasons for the conclusions. Such depositions were the result of their affidavits, especially in light of Ansul's refusal to provide complete answers to the related interrogatories. Therefore, Ansul must present Seaberg and Hubert for depositions as well as fully answer the related interrogatories.

Secondly, Ansul has refused to answer eight interrogatories from the plaintiff's Third Set of Interrogatories. After stating boilerplate objections, Ansul answered Interrogatory 5 from this set, but it failed to answer the heart of the very short ques-

17

tion:  to identify the person who headed the "Ansul Corrective Action Program."  This is neither a complex question nor could any of the boilerplate objections preclude the identification of the employee.

Ansul objected to the remaining seven interrogatories because they "exceeded the twenty-five (25) interrogatories permitted by FRCP 33."  However, the joint discovery plan in this case included an agreed maximum of 60 interrogatories.  Although Ansul has argued that it was not a party to this case until after the plan was implemented and never affirmatively agreed to the maximum number, that argument is not convincing.  Counsel for Ansul participated in a telephonic status conference with the court on June 8, 2007, and had ample opportunity to object to the discovery plan but did not.  The agreed maximum of 60 interrogatories is controlling, and Ansul must answer the remaining interrogatories.

Third, Ansul has objected to or has provided incomplete responses to six production requests from Carlson.  For each, Ansul has recited similar litanies of boilerplate objections, but  only in its Response is the specific objection sometimes revealed.  Likewise, the bulk of the argument was based on its Motion for Summary Judgment.

Request 2 asks Ansul to produce all correspondence with Underwriter's Laboratories, Inc., related to the R-102 fire suppression system or the crystallization process.  Ansul's response, that the system "has always been UL approved" was

insufficient. Ansul's contention that the Request "asks for all correspondence with Underwriter's Laboratories, Inc." highlighted the problem. Such discovery is relevant because any information regarding testing of the crystallization in that system is the crux of this case. Because the request is limited to the specific system and the specific problem which contributed to the fire, the request is granted.

Request 3 asked for all "sales brochures, catalogues and the like" that were used to promote the R-102 system. Though Ansul has contended that such a request is broad, the simple interpretation of the request is reasonable: provide the prepared marketing information that was given to customers and potential customers for the R-102 system.

Request 4 sought "all materials used to train employees of Reliable Fire Equipment Co., including all written publications, seminar or formal training materials such as slideshows, movies and photographs, and an attendance list of all employees of Reliable Fire Equipment Company who attended such training sessions presented by Ansul, Inc., prior to May 10, 2005." Ansul cannot argue that its products and corrective action program were not at fault and that the fault was in Reliable's implementation of that program, yet refuse to divulge how Reliable was instructed. Moreover, discovery relevant to any claims against Reliable come within the scope of Rule 26(b)(1) (allowing discovery on any matter that is "relevant to any party's claim or defense."). As such, the request is granted.

Request 5 sought all Ansul bulletins related to the R-102 fire suppression system. Although Ansul provided those bulletins related to crystallization, those involving service protocol, maintenance procedures, recall notices, warnings, and remediation are all relevant and should be provided.

Requests 9 and 10 asked for drawings, sketches, or blueprints for certain specified parts of the system. Carlson indeed is entitled to any information which may establish a potential cause of the fire.

Therefore, the Motion to Compel Ansul, Inc. to Present Affiants for Depositions, Answer Interrogatories and Produce Materials [DE 83] is **GRANTED.**

The final motion is the Motion to Compel Ansul, Inc. to Produce Documents Requested in Plaintiff's Third Set of Production Requests. Again, Ansul's arguments were the same and not convincing. Because Ansul's response was filed after this court's opinion and order denying summary judgment, reliance on the IPLA statute of repose was not in good faith. Thus, all of the Requests are granted. Because all actions done by Reliance at the instruction of Ansul are relevant to claims in this cause of action and the provision of promotional materials already was granted, Request 2 is also granted. Therefore, this final Motion to Compel is **GRANTED.**

Both parties included requests for attorney fees and costs. Carlson asks the court to have Ansul pay reasonable costs and fees related to this discovery dispute for the last two motions

discussed, and Ansul has requested the same in its final re-
sponse.  Rule 37(a)(4) governs the imposition of expenses and
sanctions related to a motion to compel.  It provides, in part:

> [I]f the disclosure or requested discovery is
> provided after the motion was filed, the
> court shall, after affording an opportunity
> to be heard, require the party . . . whose
> conduct necessitated the motion or the party
> or attorney advising such conduct or both of
> them to pay the moving party the reasonable
> expenses incurred in making the motion, in-
> cluding attorney's fees, unless the court
> finds . . . that the opposing party's
> nondisclosure, response, or objection was
> substantially justified, or that other cir-
> cumstances make an award of expenses unjust.

The rule's purpose is "to promote voluntary discovery without the
need for motion practice." ***Illinois Tool Works, Inc. v. Metro
Mark Prods., Ltd.***, 43 F.Supp.2d 951, 960 (N.D. Ill. 1999).

Ansul's earlier resistance to participation in the discovery
process was genuine.  However, because the final Motion to Compel
was responded to by Ansul after this court's denial of the Motion
for Summary Judgment, and because each of the discovery disputes
were objected to with unsubstantiated boilerplate arguments, the
court awards Carlson all costs and fees arising from the time
spent on the final motion, the Motion to Compel Ansul, Inc. to
Produce Documents Requested in Plaintiff's Third Set of Produc-
tion Requests [DE 92].  Carlson shall submit an affidavit of the
expenses incurred in pursuing this motion.

––––––––––––––––––––––––

For the foregoing reasons, the Motion for Reconsideration
[DE 105] filed by the defendant, Ansul, Inc., on November 26,

2008, is **DENIED;** the Motion to Compel Discovery from Defendant Ansul, Inc. [DE 59] filed by the plaintiff, Carlson Restaurants Worldwide, Inc., on April 1, 2008, is **GRANTED;** the Motion for Protective Order [DE 62] filed by Ansul, Inc., on April 21, 2008, is **DENIED;** the Motion to Compel Ansul, Inc. to Present Affiants for Depositions, Answer Interrogatories and Produce Materials [DE 83] filed by Carlson on June 6, 2008, is **GRANTED;** and the Motion to Compel Ansul, Inc. to Produce Documents Requested in Plain-tiff's Third Set of Production Requests [DE 92] filed by Carlson on July 15, 2008, is **GRANTED.** Carlson's request for the court to order costs and fees is **GRANTED** as to the final motion to compel. Ansul is **ORDERED** to comply with the above discovery requests within 30 days of this order.

ENTERED this 12th day of March, 2009

s/ Andrew P. Rodovich
United States Magistrate Judge